The first case on our call this morning is Agenda No. 18, Case No. 105-577, Jerry Blount v. Joseph Stroud, et al. Counsel may proceed. Thank you, Judge Fitzgerald. Your Honors, I am Robin Potter, and here today with me on the plaintiff's team, Martin Dolan, and either here in person or in spirit, Plaintiff Ms. Blount, our co-counsels Terry Lavin, Collins Whitfield, and the incredible support we have, as you see in the amici from the Mandel Clinic, University of Chicago, the National Employment Lawyers Association, and the Illinois Trial Lawyers Association. Thank you for the opportunity to appear before you today to correct an injustice that has been done at the appellate court. The nature of this case is one in which a wealthy and powerful businessman tried to suborn perjury. He asked an employee to lie. She said no, and for that she was terminated. Had she complied, Ms. Blount would not be sitting here today as an employee protected under the public policy of the state of Illinois, but rather under the criminal code, she could be in a penitentiary, and that she refused to do, and that the law protects. We have before you today defendants who retaliated, and they got caught at trial with writings in their own hand, offering to pay powerful former public officials to get Jerry indicted for refusing to lie. And they said at our trial, quote, I want to sue you. They paid witnesses with lavish gifts and salaries after having them file criminal charges against her, which the chief of police of Timley Park refused to process. This was outrageous conduct found by a jury and a trial judge who stayed with us from the beginning assigned to this case in February or April, with patience and discipline, who issued over ten memorandum decisions, who after three weeks of trial, where a jury was out for four hours, he came back with a memorandum opinion in our record at plaintiff's PLA brief at 825 with a J and OV decision finding significant testimony at trial demonstrated actual malice, violence and oppression on the part of defendants with the element of outrage. The evidence submitted to this jury could be enough to support charges of assault and battery, perjury, bribery and other criminal conduct. Other than perjury, though, there's nothing before us, isn't that correct? Correct, Your Honor. The subordination of perjury is the basis of our public policy retaliatory tort under Illinois common law. These defendants fired a woman who... Is that tort that you've mentioned in any way, does it in any way relate to the Human Rights Act? No, Judge Fitzgerald. We argue persuasively, as this Court did in Maximovich, that it is not inextricably intertwined. It does not need the Human Rights Act. It stands as its own on a tort basis. But even if it does stand on its own, it can, in a given circumstance, be intertwined with a tort that is based upon the Human Rights Act? It can be intertwined factually, as this Court found in Maximovich, which was a sexual assault victim put in a cooler by her employer who tried to take advantage of her. But the Illinois Human Rights Act did not create the basis of the cause of action, even though there were some overlapping facts, because the tort stood on its own, and the question there presented as in Palmatier in the long line of cases before this Court was, was there a violation of public policy and was the employee discharged? And we have met that burden. So although Maximovich is good law, the controlling law, the appellate court did not apply it. And they should have, because this case is not inextricably intertwined with the Human Rights Act as creating the cause of action for the unlawful discharge. We don't need it. Perjury stands on its own. It doesn't matter what she was asked to lie about. It does not invoke the Illinois Human Rights Act. And in fact, let's look at the evidence of the attempts to suborn perjury and why we're here, why the Illinois appellate court went astray and substituted its judgment for this trial court and this jury. What were the facts that it cannot supplement, supplant? Do not side against me. I can cause you to cease to exist, Ms. Blount, but I will tell the truth. Defendants, why is Bonnie so special that you will side against me who made it all possible? Ms. Blount, I want, I will not make any claims that Bonnie's allegations were not true. Defendants, you need to know who you're up against. I can make you cease to exist. I told him I will not lie or perjure myself. Get the F out of my office. There is no place here for independent thoughts. Let her suffer. I am standing up for a friend and coworker. Here's a picture of myself with President Clinton. You must know how powerful I am. That does not invoke the Illinois Human Rights Act. It invokes what is at the core of the root of our duties as citizens of the state of Illinois to not engage in the criminal conduct of perjury. That is the retaliatory tort. We're here today, yes, Your Honor. In keeping with Chief Justice Fitzgerald's theme, is your response to the issue of the jury instruction, including both claims, as simple as the fact that that was just done for convenience of the jurors, or is there some other response you'd like to make? We thank Your Honor for asking that question, and if you look at our reply to that, it's very simple. In the reply brief and the appendix to the reply brief, we add the dialogue. These defendants have been well represented for six years by some of the largest law firms in this country, and it was defendants' request from Mr. Brody that that jury instruction be what it is and collapsed into one instruction on both claims. And our reply brief, I believe, sets forth the dialogue with the court on that, and we agreed that we have two claims, and only for the purposes of the instruction would the claim be presented to the jury in the instruction. It was a defendant's request. They wrote the verdict form, and they wrote that instruction. And we'll note, Your Honors, that issue is waived. It was never raised by the defendants in the JNOV or in the appeal to the appellate court that was created out of whole cloth by the appellate court and should never have been before it. And we can quote you, and we do quote in that case. I do have a question, though. Yes. And it does relate itself to the perjury claim. Yes. Assuming that we find that the trial court had subject matter jurisdiction over the retaliatory discharge claim based upon plaintiff's unwillingness to commit perjury and not based upon her support of her co-worker, what should be the disposition of this case? I think, Your Honor, two things. The disposition is clear, and that's why we're here. Reverse, infill, and reinstate the jury verdict and his honor's JNOV. And the circuit court's refusal to grant a JNOV. Because at the same time... Is there any problem with that, with the joint instruction, in that I would think it might be argued you don't know what the basis of that finding was from the jury's following the joint instruction? I think we know the basis of the joint instruction, Your Honor, because it was defendant's instruction and because, as Judge Goldberg read to the jury, it includes both at defendant's request and the defendant's request. And it says, I'm now going to give you the instructions relating to plaintiff's first claim in which plaintiff alleges she was terminated by defendant Jovon in whole or in part in retaliation for her protected activities, one, including her refusal to agree to commit perjury, and her support of Ms. Foutt's claim of discrimination, and or opposing defendant's treatment. We say to that that both issues were presented to the jury, the verdict form is attached here, and they agreed to that. They could have said no, but they didn't because they found both, as they were asked to do. The significance of the, if the instruction being the defendant's instruction, was the defendant's instruction to couple the two issues together? Yes, and we cited for, Your Honor... Yes, yes, if I may. Is your theory that any error that flowed from that would be invited error? Yes, and there was no error and it was never appealed. It came from whole cloth from the... Invited error and waiver. Complete waiver. Complete unadulterated waiver. This defendant never challenged the instruction in the JNOV or to the appellate court. They claim that they filed 12 different motions, not a one challenging their instruction, nor could they because Jenna wrote the instruction, and we simply agreed for purposes of the instruction. And I believe we cite Mr. Brody's exchange with the court in our reply brief. And I can almost put my fingertip on the page in a moment to assist, Your Honor. So it's a complete waiver, and the jury heard all the evidence. They heard the evidence that she was retaliated against under Section 1981 of the Civil War Amendments because she testified and agreed to testify on behalf of a white co-worker in her federal discrimination claim. That issue was presented, they had an opportunity to reject and sign on the verdict form, no. But they said yes, and they appointed damages for that. We will say, judges, justices, that it is very clear that we all know that 1981 is a different remedy than the public policy tort remedy. When the jurors came back and assessed damages in the verdict forms, they assessed punitive damages under Section 1981, and very clearly, they said no. Clearly, we were awarded attorney's fees under that statute, which does not apply to the public policy tort, because that's a common law claim. Is the 1981 claim still before us? It is only before, Your Honors, on two issues that were presented in the JNOB and to the appellate court, which is, one, this is the only thing these defendants appealed. Is it preempted by the Illinois Human Rights Act? And, two, is that a cognizable claim, because the courts do not recognize the right of a co-worker to stand up for another co-worker who is a victim of discrimination and retaliation, only stand up for herself? The nail is in that coffin. Just within the last 60 days, the United States Supreme Court has ruled in Humphreys, which is dealt with extensively in our briefs, that Section 1981, to implement the 13th Amendment, does not apply. The 13th Amendment is so serious of a statute that it covers retaliation for brave co-workers like Jerry Blount, who say, I will testify for others who are victims. That was defendants' only appeal, that it didn't cover the rights of others to testify for other victims. That issue is over, and, in fact, the issue of preemption is over by virtue of the holding in Humphreys, where the United States Supreme Court has ruled in Humphreys. The United States Supreme Court has said 1981 is so expansive that even Title VII cannot supplant it, it supplements it, just like the Illinois Human Rights Act is a supplement. The other reason we're here is under the Federal Supremacy Clause, the Illinois Appellate Court cannot say, and after Humphreys, it's over, cannot say that a state statute can gut the right of victims to testify. And I read to you that what compels reversal, also why we were here, on that limited issue that the defendants raised, and, Your Honor, as Judge Fitzgerald has so carefully asked me, the issue of those instructions was not before the Appellate Court, not in the briefs, not in the JNOV, because it's defendants' instruction and never appealed. And why the Appellate Court also compels reversal and makes it clear that 1981 claims remain, quote, separate, distinct, and independent. 128, Supreme Court at 1960. The other reason we're here is the egregiousness of the Illinois Appellate Court in granting a JNOV under the facts of this case and on what we know as trial lawyers and trial judges and appellate judges in Illinois. And the reason why we're here is because the Appellate Court did not grant a JNOV under the facts of this case and on what we know as trial lawyers and trial judges as to what an appellate court cannot do, and notwithstanding our deep respect for the Appellate Court, they went too far. And what they did is they supplemented, supplanted the fact-finding mission of a judge and jury, and they substituted their opinion and facts to find that there was no evidence of the attempt to subpoena perjury, not on this record, not in this trial. Mr. Dolan and I have been there since the beginning with Judge Goldberg. Through three weeks of this trial, we recognized defense counsel, who is now current counsel, was not there at the trial, but the record is clear in 29 volumes of transcripts presented to you. It is an extraordinary... Yes, Your Honor. Should this jurisdictional question be decided on the proofs in the case or decided on the pleadings? I think both. I think we have a, the record is as a whole, when you look at the record as a whole, and our pleadings are very clear as to what is in the record and what isn't in the record. If I'm following your question? I think you're saying that on both, you'll find it both in the facts and in the pleadings. Correct. And I think when you grant a JNOV, you have to look at the facts, but the Appellate Court cannot substitute its opinion for the fact-finding mission of a circuit court judge and jury. We all know that the standard is extraordinary to grant a JNOV, and that's why we're here, because Appellate Courts cannot do that. You must look, in response to your question further, at the, all the evidence, and all the reasonable inferences most favorable to the non-movement. How could one ever say that telling an employee who says, I will testify for a JNOV, is not a good thing? If a white woman in a federal discrimination case, and I will support her and I will not lie in any manner or respect or proceeding, and the response of the employer is, I can make you cease to exist, you will not testify against me? That is not, one, the subordination of perjury, and two, retaliation within the meaning of 42 U.S.C. 1981? Those matters, we think, have been really put to rest, one, by this Court. You just used the phrase, you will not testify against me. Yes. Was that a reasonable inference from the evidence, or was there actually evidence of that statement? I believe it is both. I believe it is both, Your Honor, and at the very least, it's an inference when defendant said, do not cite against me, you will not testify against me. I will not testify for Ms. Fouts, and Ms. Blount said, I will testify for her, I will tell the truth, I will not lie. I will not lie. And that's in this record, over and over again, and it is not just Ms. Blount's testimony in the trial record, Your Honors. It is the testimony of Kathy Harden, another witness, and the trial record in this case was found to be so outrageous by our jury, both on the 1981 retaliation claim, and on the subordination of perjury, that the punitive damages issue went to the jury. The defendants argued that, yes, Your Honor? It's pretty clear, it seems, that the appellate court says that the evidence used at trial does not support her allegation that she refused to commit perjury. And then they went on to say that the other claim is identical to the definition of a claim for retaliation under the Human Rights Act. What standard does the appellate court use in making that statement that is not supportive? Do they do manifest weight, or is it a manifest weight, or what should we use? Well, I believe the case comes to you for de novo review, and I believe it came to them de novo. But that is not a license to sit as a... De novo on the factual findings? I believe de novo on the facts and the law, Your Honors, and I believe... Would it not normally be a manifest weight standard if there's a finding by the trier of fact that perjury was, in fact, attempted to be suborned? And if the trial court... Your argument, I think, is that the trial... The jury, even though the instructions were collapsed, made a finding that there was a threat that the plaintiff should commit perjury or she'd be discharged, if the jury, in fact, found that, do we review that finding de novo, or do we use a manifest weight standard? I believe it's a de novo standard, unless I'm incorrect. And when the appellate court used that de novo standard, that is not a license to rewrite the facts. And that's what they did, and that's what they cannot do and why we are here. They cannot substitute their judgment as what they'd like the facts to have been. It is in this record. I would also like to note, for Your Honors, on page 3 of our reply brief, the exchange that we were asked about, where it's the defendant's lawyers who wrote the instruction that Judge Fitzgerald, Justice Fitzgerald asked about earlier, and why this is still a firm verdict to be affirmed on Section 1981 and why the verdict does not have to be parsed out. Mr. Brody, I made a suggestion, looking at Ms. Potter's instructions, 7A and B, they're identical, except for a couple of words. 7A, which we've already looked at, defined the protected activity as including her support of Ms. Fouts' claims of discrimination for opposing defendant's treatment, and 7B was the same, except it said including a refusal to commit perjury. I'm proposing that we just combine these two so it will read, Ms. Blount-Clark, who claims she was terminated by defendants in whole or in part in retaliation for protected activity, including a refusal to agree to perjury and or her support of Ms. Fouts' claims of discrimination and for upholding defendant's treatment of Ms. Fouts. We ask this verdict be upheld in full and that the JNOV entered by the upheld court be vacated. Thank you. Mr. Till, if I could please the court. Your Honor, it has indeed been a long call for both sides. We would say that the injustice that's been done in this case is the injustice that's been done to my client for the last six years. He's been a legally wiretapped, she's a legally wiretapped congressman. This case had a number of issues that were involved with respect to her. Are we in the record somewhere with the illegal wiretap? Yes, Judge, it's there. But, Judge, I want to go right to the heart of where you started this case off, because this case is really about, are her claims inextricably bound to the Civil Rights Act? And the one thing that she doesn't talk about when she was here is, what is the Civil Rights Act? The Civil Rights Act says it's unlawful to retaliate against a person because she has opposed that which she reasonably and in good faith believes to be unlawful discrimination. Now, Judge, Your Honor, let me tell you what she did in this case. If you take a look at both of her counts, both counts three and count five, that is how she pled those counts. She did not plead those counts that there was retaliation because I refused to perjure myself. Both of those counts, count three was the 1981 count, and count five, of course, was her protected rights count. They both had two interdependent thoughts, perjury and the support. Those are intertwined with the retaliation claim of the Civil Rights Act. I'll legislate. Mr. Jones? Yes, Your Honor. Did the appellate court overlook the phrase civil rights violation as used in the Human Rights Act as a specifically defined term? And let me just tell you the quote here. 103D, 1-103D of the Act plainly states, when used in the Act, 888 civil rights violation includes and shall be limited to only those specific acts set forth in the sections, and then they go through a variety of sections. In other words, the Human Rights Act commissions jurisdiction extends only to civil rights violations set forth in the Illinois Human Rights Act. So my question really is, under that limited, as a specifically defined term, is a claim brought under Section 1981 a claim under the Illinois Human Rights Act? Yes. Yes, Judge, because what they try to do under 1981, for the last 20 years in Illinois, federal claims have been, they are subject to the Illinois Human Rights Act. Under what I read, under the specifically defined term, and the various sections, 2-102, 103, I mean, I don't want to go through them all, which section does the 1981 claim fall under? It falls under, Your Honors, it would fall under what I've read, under the retaliatory discharge, under what's defined as a civil rights violation, is the 56101. And it would fall under that section. It's the same civil rights violation as the retaliatory tort claim. And when you take a look at all the case law for the last 20 years, whether it's 1981, 1983, they have all, for the last 20 years, every court that's ever looked at this found, whether it's age discrimination, they all fall under, they're all federal civil rights claims that are subject to the Illinois Civil Rights Act. Well, let me put it this way. Both sides cite mine versus Masonite Corporation. That's correct. A case out of this court from 1985. I'm a little confused as to why it's cited, and I'll tell you why. The court in that case did not say whether it was using the term in a broad or generic sense, or whether it was using it as specifically defined in 1-103D, what I just read you, as to what civil rights violation, whether it would fall or not. So I think that isn't the whole point of this appeal for this court to announce what we meant in mind? Your Honor, I don't think so. I think that obviously this court is free to do that, but what's happened for the last 20 years after mine, every appellate court in every district in Illinois that's read that says that federal civil rights claims fall under the jurisdiction of the Illinois Human Rights Act. Now, obviously what you decided in mind is. And I'm going to let you go after this one, but what significance, if any, then, does Section 1-103D have when it seems to limit the jurisdiction? Well, yes, it limits it to civil rights claims. And what I would say to you, Your Honor, is if our legislature, which we've had this system going on for 20 years, if they wanted to at any time, seeing where all the courts have said that it's a civil rights claim, they could have changed that. They've never done that. We still have the same statute. And it's, you know, we would say that both these arguments, where they would have us change the law and give us no basis for doing it in over 20 years, and the legislature has decided not to do it in over 20 years, and their arguments on a preemption fall into the same category. You know, what they don't cite to you is the Jackson case. Before you get into the case, so what, and I guess I lied to you. I said I was going to let it go. That's all right, sir. But this is an important point, or I wouldn't be asking it. Civil rights violation. I just want to understand your argument. As used in the Human Rights Act, under the specifically defined term analysis of 103D, you are saying that a 1981 claim falls under that, even under, even using civil rights violation as a specifically defined term. You're saying it's, even if we look at it as a specifically defined term under the act, a 1981 claim falls under that. Yes, no different than this court, no different than all the courts have found that 1983, age of discrimination, take any federal civil rights claim. Yes, it falls under the Illinois Human Rights Act. Okay. And preemption plays no part in the decision of this court? Let's talk about preemption for a second. For a little bit, but I have another question. Well, you want me to talk about preemption for just a second? Preemption. Under Jackson, which is the latest, you know, they talk about Felder, and then they give us four cases that are after Felder, but all before Jackson comes along. It says that with respect to federal claims, you take federal law, you have to take the state courts as you find them. Meaning that you, the state courts are free to do their neutral application of the law, as long as it's neutral, as long as it's not outcome determinative, as it was in Felder. And this Illinois Human Rights Act has always been administrated neutrally. It is not outcome determinative, and that is what the appellate court found, and it's what the courts have always found with respect to this act. So there is no preemption under Jackson. Did you have another question, Your Honor? I do. And I'll make it a little two-parter, but it's really a question I ask Ms. Potter, too. The ultimate issue in this case is whether the circuit court had subject matter jurisdiction or whether they had lost subject matter jurisdiction to the commands of the Human Rights Act. Isn't that correct? That is correct, Your Honor. All right. If, in fact, the trial court had subject matter jurisdiction over the retaliatory discharge claim based on plaintiff's unwillingness to commit perjury and not based upon her support of her co-worker, what should the disposition of this case be? Well, I think that, Your Honor, that because there were so many other issues on appeal, I can't see but anything but that it would be sent back to have those issues resolved. Was counsel correct when she suggested that the combined instruction was tendered by the defense? Judge, this combined instruction was agreed to by both sides. This combined instruction, that's why I have you read her count three and her count five. The reason this instruction was all raveled into one, they are the identical language of her count three and count five. I just have Your Honors take a look at it. Her count three and count five are identical, and that's the language that was used. It was an agreed instruction. It's not something that we dreamt up out of whole cloth. She agreed to that instruction. Somebody tendered it. Which side? Judge, I can't tell from the record. I think it was agreed by both sides. But I'll tell you why it's agreed to by both sides. She wouldn't have agreed to it if she thought it was something that didn't go along with her count. Just read her counts. It's virtually the identical language in both count three and in count five. Count three being the 1981 client and count five being the retaliatory discharge client. Well, that, just to end with another question I asked her, in deciding the jurisdictional question, do we look to the proofs in the case or do we look to the complaint in the case? I think we have to look at the pleadings of the case, what was pled. I think that really what this case really comes down to is in order to be able to find inextricably bound, what did you, what are the pleadings, what did you argue to the jury? What was the jury told that the protected rights claim was here? You know, your honors, we would not be here if she had put in the jury instruction that her protected right claim was solely perjury. Then we'd be at the palatia. But that is not what she did. She always, and look at what she argued to the jury, look what she said in opening statement. Look what the jury instruction is. She always said it was two interdependent acts, that there was perjury and support of Ms. Faust's claim. That takes us right back to what the legislature has defined as a civil rights action. That's it, right on the money. They are intertwined. Your honors, ask yourself this. Why in both her response and in her reply brief does she dodge the jury instructions? She doesn't say one word about this where we say the intertwining in the jury instructions, the interrogatory that was sent to the jurors, and the counts three and five. The reason they don't want you to focus on that is because that, your honors, is what the intertwinement is all about. That's what was told to the jury. This jury wasn't asked to decide that, ladies and gentlemen, they weren't given an instruction and said, look, her protected rights claim is solely perjury. And if you find perjury, that's all you need. She bundled it and intertwined it with the civil rights claim that I've read to you. You can't get away from it. As your honors have said, when you do that kind of intertwinement, you can't decide the legal duties of this claim without reference to the intertwinement that she did. So therefore, this claim is so clearly intertwined, this is what the jury based this decision upon. This is what they were told. This is why the Court of Appeals did what it did. And incidentally, they didn't supplant their thoughts. When she says, first of all, there's nothing in the record about you were never testified against me. That is absolutely not, that's not in the record. The only thing, as the Court of Appeals pointed out, was he said from time to time, you know, why are you not supporting me? And I would say this to you, what the Court of Appeals does in passing, they did not usurp anything. They only said that in passing, it just looks to us, we didn't see anything about perjury. But their ruling, as your honors will see, is strictly on whether there was intertwinement between the protected activities claim and the civil rights claim. That is solely the basis for what they did. And of course, they looked at the 1981 claim and said, well, well, first of all, there's a good question of whether even Can I stop you so I'm sure I ask you this 1981 question and you have a chance to answer it? Your honor, please. The issue on the 1981 issue is whether or not the state law gives a neutral result. In other words, the same for either state or federal. Isn't that correct? Don't forget, her 1981 claim is in two parts. One, that 1981 is not subject to the Illinois Human Rights Act because somehow for 20 years Illinois courts have got it wrong. And then the second part of it somehow is the 1981 preemption argument. Yes, it's in two parts. In determining neutrality, should we look at the difference in damages between the state source of relief and the federal source of relief? No, because as Jackson points out, it's only outcome determinative. As Jackson points out, the statutes don't have to be identical or the same for things like that. Jackson specifically says they don't have to be monolithic. What the key feature is. So your answer is the difference in damages is of no import in this analysis. Absolutely. Absolutely. That's not it. That's when Jackson talks about outcome determinative. They're talking about would the result be different with the state statute as far as outcome. And Jackson makes that very clear. And they talk about where that was a great case where the state had said, no, you're not going to be able to do interlocutory appeals, which was a key thing if you were a federal official. And Jackson says, uh-uh, just because they wouldn't let you do interlocutory appeals were these other things that they talk about. The state statute doesn't have to mirror, doesn't have to be monolithic. The only consideration that you have is does it change the outcome of the case? And we would say to you that the Illinois Human Rights Act does not change the outcome of the case. And that's what Jackson is talking about. And that's why when she cites to you, you know, when she tries to give you, when the plaintiffs give the preemption argument, they give you four cases that were all decided before Jackson. They all are inaptible, as the court of appeals showed you, to what's going on here. You've got to look to what the Supreme Court, as how they define the neutral application of these rules. And we take you back, you know, into this case. What plaintiffs really want to do now is they want to create an argument out of whole cloth that was never given to the jury in this case. The jury was told quite specifically from opening statement to closing arguments to the very instructions that they were given, that this case is not just about perjury, that this case is as encompassed by the Civil Rights Act, that the retaliation was that she opposed that which she reasonably in good faith believed to be unlawful discrimination. You know, your honors, she chose this path. She decided to forego the Illinois Human Rights Commission. She took the path not to go if she wanted to take a straight claim in 1981 to the federal courts. And the moment she did that, and she was intertwining these two, she put herself within the jurisdiction of the Illinois Human Rights Act, which I might say that our legislature has put considerable resources in ever since before the decision that you made in mine. They have chosen that as the vehicle for certain Civil Rights Acts, that any acts that fall within that, which clearly we have one here, falls within that. And that's what was done in this case. That's why she attempts in her pleadings both in the response and the reply, she doesn't want to talk to you about that jury instruction. She doesn't want to get up here and say, but wait a minute, counsel, what about the part where you put not just perjury and supporting Ms. Faust? Why isn't that intertwined? How do you get out of the Civil Rights Act when you do that kind of intertwining? Because they avoided that like the devil avoids holy water in their briefs, because they know that's what the Court of Appeals bottomed its decision on. And we would ask you that based upon this and based upon the longstanding law in Illinois with respect to federal Civil Rights Act, that, you know, one thing I forgot to argue about in 1981. You know, it could be that in this case there's no 1981 verdict, because you know what the court refused to do in this case? When they went back and asked the judge, because they realized 1981 requires that the judge make some kind of finding on the record. They go back in the nook pro tonk, I just have you look at this, and they go back and say, oh, my God, we didn't do that. And they go back and they give the judge this order. Judgment is entered on behalf of Plaintiff Jerry Blondin against defendant broadcasting for her claims under 42 U.S.C. Section 1981 and the Illinois Tort of Retaliatory Destroyed. Guess what? The circuit court refused to sign that. He refused to sign that this verdict was also a 1981 claim. Now, yeah, we understand that he gave damages. Mr. Jones, do you have at your fingertips under the act what section 1981 would fall under with respect to the definition of civil rights violation? No, I don't, John. Now, I don't have it without looking to see what the various ones have been in the past. But I'm confident by looking at what the courts have done for over 20 years, whether it was age discrimination, whether it was 1983, that it would fall under that same section. One of those sections? Right. And, you know, finally, with respect to Humphreys, Humphreys has nothing to do with this. But your first argument is we don't even have that issue before us. I'm saying that there is a possibility that you don't even have a 1981 claim in front of you. But I think that this court needs to think. Well, could we be faced at any point with the necessity of remanding it for a decision on that issue? I don't think so, because, Your Honors, I think that because it's so clear that even if they did have a 1981 claim, that it would have the same fate, that it would be intertwined with the retaliatory discharge claim. And so I don't think so. You have a red light, but I do want to give you a chance to deal with one other area. Thank you, Robert. And I think that a firm reading of Jackson will show you that when these issues were brought in Jackson, they go through a number of different cases. And that's what they mean, that the state, in determining the neutrality, it don't have to be monolithic. It doesn't have to say, well, okay, certain things would be true under the state. Certain things would be true under the federal. What the federal case, Johnson, wants you to understand is the key thing, their distinction with Felder is, is it going to be outcome determinative? And that's why in answering your question under Johnson, just think about this, that the federal people could have bought interlocutory appeals that had been brought in federal court, they would have immediately gotten an interlocutory appeal. Idaho says, no, if you bring this in state court, you're going to find the state courts as you find them. Our administrative law says that you're not going to get that interlocutory appeal. And Johnson says that's okay, because what's done here is not outcome determined. Thank you, Mr. Johnson. One quick question. You said in passing at the end we might not even have a 1981 claim here. Would that just do away with both your and the appellate court's subject matter jurisdiction argument? I mean, you're not saying a perjury count, there would be jurisdiction. I know you're saying they were merged together, but you ended by saying there might not be a 1981 claim. That wouldn't come under the human, the perjury count wouldn't come under the Human Rights Act in and of itself, right? Well, her retaliatory discharge claim, which was of the two parts, we say that there was no jurisdiction because it was intertwined. And only if there was no 1981 claim, that would just be, we would have this whole argument about 1981. That's the only thing that I'm saying there, Your Honor. All right, thank you. Thank you, Your Honors. One, I'd like to correct Your Honor's question with regard to the standard of review in this court with respect to matters of law. It is de novo and I believe with respect to facts, it's manifest weight. What I'd like to cover in my three minutes, in my ten minutes remaining, is what is and is not in this record. I believe a litigant does not have a right to stand before this court and distort a record. In not one brief did these defendants challenge whether there was a 1981 case. In the jury instruction conference, they didn't challenge that. In the appellate brief, they didn't challenge it. It's only in this court, it is weighed, it is a non-issue. We tried the issue of retaliation for ‑‑ So your position is you have a favorable verdict on that? We have a verdict on that. What's the significance of the trial judge not signing the order? The order that was read was signed. It was signed and agreed to by all parties. And because we had a verdict on both counts, his Honor entered a final judgment setting the back pay amount. I believe the defendant was not accurate with your Honors and the NUNC protunque is in the record. His Honor never refused to sign it. We rewrote it and reached an agreement. Just like the distortion here that this was my jury instruction on my verdict form, we've read to you from our reply brief quoting defendants' counsel, page 3 of our reply brief. I think we should argue what is in this record and what's accurate. When we look at the retaliation verdict that's attached to our brief and appendix and at A23 and it's in the record at C4981, these were agreed to. The 1981 issue was tried. It is not an issue that was not before this jury. We put on evidence for three solid weeks and for the five years before that. This issue has never come up in the briefs until this court that the 1981 issue was not before the jury or before Judge Goldberg. And that issue, your Honors, is not, that verdict should be reinstated and the JNOV reversed. And as Judge Thomas has asked here, what is in the Human Rights Act that's covered by 42 U.S.C. 1981, a statute passed in 1866. We're dealing with 150 years of law to implement the 13th Amendment. That provision very carefully covers the right of black citizens to enter into contracts. The same as white people to be parties to give evidence to the full and equal benefit of the laws as enjoyed by white citizens. The Human Rights Act does not cover all contracts. The Human Rights Act has a 180-day statute of limitations. 1981 is four years. The Human Rights Act had no right to a jury trial when this case came before the court. Ms. Potter, I spent considerable time with Mr. Jones regarding the civil rights violation, the specifically defined term in the Human Rights Act. Do you want to comment on that? I don't think that, but I think you're correct, Judge Thomas, that as the meek eye from the University of Chicago, Itla, and Nilo argue, it is time to clarify mine. That the purpose of this statute, and it's well known that the Mandel Clinic lawyers wrote the initial statute in the amended act. And when you look at that statute, it does not say, nor did this court say in mine, that it displaces all other civil rights laws. It only displaces a claim like mine, which was a retaliatory discharge for age discrimination that the plaintiff had pending at the commission. And Humphreys does put this to rest, and the Humphreys issue was before this court, put in there by the defendant, which argued there was no 1981 claim, because 1981 did not cover retaliation for testifying or participating in a civil rights case. And I have to call the question. If we look at the civil rights violation as used in the Human Rights Act as a specifically defined term, that you disagree with Mr. Jones that you would find a 1981 claim in one of those delineated sections? I disagree on two points. One, that you don't, because what that statute means, as this court said in mine, was claims brought under, civil rights claims brought under the Human Rights Act. And secondly, the United States Supreme Court says in Humphreys, it doesn't matter as a matter of constitutional law in the supremacy clause, because the states cannot stop citizens from bringing 1981 claims in state court. Not one of the cases in these briefs is a 1981 case except Humphreys. And 1981 is a special law because it's broader. I don't know what the Jackson case is that was cited. I assume Kelly will know. It's the Meek I Say. If this Appellate Court's decision stands, it will wreak havoc in this court and all the courts below come January 2009 when the Human Rights Act cases start being filed in the circuit courts of Cook County under the amended act, House Bill 1509, which we discussed extensively. You will now have litigants raising a claim under that statute. And if the circuit courts start dismissing those as preempted by the Human Rights Act, then we will have a constitutional problem, which this court can now correct and Judge Thomas aptly pointed out, say we didn't mean that in mind, as the amicus has argued. We only say that cases brought under the Human Rights Act are the ones that are brought under that act. And furthermore, as enunciated in Humphreys, except as otherwise provided is what our Human Rights Act says. So I think it's very clear. And the 1981 case was tried and should be affirmed. The JNOV vacated. That is a totally different claim than the Illinois Human Rights Act claims. It's a totally different claim than the subordination of perjury. Count three of our complaint, which is an appendix. What was the judgment on? The judgment, Your Honors, was $258,000 in back pay. It's at 823 of our brief. I know that. What was the judgment on the 1981 claim? The 1981 claim on page 39 assesses punitive damages in the amount of $2.8 million. And I think that's on both claims because the defendant asked it be presented that way. And they waived it. You won't find one brief from this defendant. Who tendered the instruction? It's the defendant. And I read from, Your Honors, Mr. Brody's tender to the court on page three of our reply brief. In closing, why we're here is because an egregious error has been made. This court has an opportunity, as argued by Mandell, Itla, and Neela, to correct a misinterpretation of mine, to prevent a constitutional problem, to prevent a problem where an appellate court substitutes the judgment, to reinforce the Humphreys decision, which was before this court in prior briefing and in the JNOV. Reinstate a verdict, invoke the protections of the Illinois laws of public policy to invoke in our citizens the right to be protected when standing up against criminal behavior and not to be retaliated against for that. And also under 1981, to be able to vindicate the right to support someone in a civil rights case, which has nothing to do with the Illinois Human Rights Act. I close in memory with a plaque that's outside of the Southern Poverty Law Center, which says justice should flow free like the waters. And that's why we're here, to ask you to reinstate that verdict so that citizens of the state of Illinois and employees like Jerry Blount can enforce the rights of herself, fellow employees and citizens, both under 42 U.S.C. and under the public policy of the state of Illinois in our state courts. Thank you. Thank you, counsels. Case number 105577 will take the floor.